IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHARLOTTE M. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3256 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | MEMORANDUM AND ORDER ON |
| Social Security, | ) | REVIEW OF THE FINAL DECISION OF |
| | ) | THE COMMISSIONER OF THE SOCIAL |
| Defendant. | ) | SECURITY ADMINISTRATION |
| | ) | |

Now before me is Plaintiff Charlotte M. Campbell's complaint, ECF No. 1, which was filed on December 17, 2009. The plaintiff seeks a review of the Commissioner of the Social Security Administration's decision to deny the plaintiff's applications for disability insurance benefits under Title II of the Social Security Act (the Act), see 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI of the Act). The defendant has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 12, 13.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 22; Pl.'s Index, ECF No. 23; Def.'s Br., ECF No. 29.) I have carefully reviewed these materials, and I find that the case must be remanded for further proceedings.


## I.    BACKGROUND

On or about May 15, 2003, the plaintiff filed an application for disability insurance benefits and SSI benefits. (Transcript of Social Security Proceedings (hereinafter "Tr.") at 358, ECF No. 13.) This application was denied by an Administrative Law Judge ("ALJ") in a decision dated June 6, 2005. (Pl.'s Index, Ex. A at 9, ECF No. 23.) On October 5, 2005, the plaintiff filed a new application for SSI benefits. (E.g., Tr. at 23C.) This new application was denied on initial review,

1

(Tr. at 23C), and on reconsideration, (Tr. at 23A). The plaintiff then requested a hearing before an ALJ. (Tr. at 36A.) On April 28, 2008–prior to the hearing on the October 5, 2005, application for SSI benefits–the plaintiff filed a new application for disability insurance benefits. (Tr. at 38). It appears that the April 28, 2008, application for disability benefits was then combined with the October 5, 2005, application for SSI benefits so that both applications could be addressed during the hearing that had previously been scheduled to resolve the October 5, 2005, application. (See Tr. at 404.) The hearing was held on May 28, 2008, before the same ALJ who denied the plaintiff's application of May 15, 2003. (See Tr. at 404; see also Pl.'s Index, Ex. A at 9, ECF No. 23.) In a decision dated June 13, 2008, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits or SSI benefits. (See Tr. at 14-23). In reaching this conclusion, the ALJ made the following findings:

1.   The claimant met the insured status requirements of the Social Security Act through March 31, 2008.

2.   The claimant has not engaged in substantial gainful activity since July 1, 2005, the alleged onset date.

. . . .

3.   The claimant has the following severe combination of impairments: degenerative disc disease, thyroid disease, and asthma/COPD related to smoking.

. . . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . . .

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally lift twenty pounds and [lift] ten pounds frequently, stand/walk six out of eight hours, and cannot engage in postural activities, including ladders, ropes, and scaffolds more than occasionally. The claimant cannot be exposed to extreme cold, heat, fumes, or hazards.

2

. . . .

6.  Step 4: The claimant is capable of performing past relevant work as a[n] inserting machine operator and production assembler.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

. . . .

7.  The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2005 through the date of this decision.

(Tr. at 16-18, 22 (citations omitted).)

The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (See Tr. at 10.)  This request was denied, (see Tr. at 5-7), and therefore the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On December 17, 2009, the plaintiff filed the instant action.  (See Compl., ECF No. 1.) Among other things, the plaintiff seeks an order stating that she is entitled to disability insurance benefits and SSI benefits and "remand[ing] this case for further hearing before a different Administrative Law Judge."  (See id. at 2.)[1]

## II.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).

---

[1] To be clear, the instant complaint calls for a review of the applications filed in October 2005 and April 2008.

3

Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Finch, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

I must also determine whether the Commissioner's decision "is based on legal error." Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ continues the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c); id. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  Step three requires the ALJ to

4

compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. §
404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If the claimant has an impairment "that meets or
equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20
C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed
impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. §
404.1520(a); id. § 416.920(a).  Step four requires the ALJ to consider the claimant's residual
functional capacity[2] to determine whether the impairment or impairments prevent the claimant from
engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. §
416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will
find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. §
416.920(a)(4)(iv), (f).  Step five requires the ALJ to consider the claimant's residual functional
capacity, age, education, and past work experience to determine whether the claimant can do work
other than that which he or she has done in the past.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. §
416.920(a)(4)(v), (g).  If the ALJ determines that the claimant cannot do such work, the claimant will
be found to be "disabled" at step five.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v),
(g).

 "Through step four of this analysis, the claimant has the burden of showing that she is
disabled."  Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  After the analysis reaches step
five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the
economy that [the] claimant can perform."  Id.  In this case, the ALJ reached step four of the
sequential analysis and concluded that the plaintiff was not disabled.  (See Tr. at 22.)

---

 [2] "'Residual functional capacity' is what the claimant is able to do despite limitations
caused by all of the claimant's impairments."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)
(citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

### III.   SUMMARY OF THE RECORD

The plaintiff alleges that she became disabled on July 1, 2005 due to arthritis in her arms, back, and shoulders, a "weak immune system," and "COPD."[3]  (Tr. at 61, 150.)  She was born in December 1951; thus, she was 53 years old on the alleged onset date.  (Id. at 38.)  She completed the tenth grade in school and eventually obtained a GED.  (Id. at 67.)  She has work experience as a production assembler, a production machine tender, an inserting machine operator, and a general cleaner.  (Id. at 182.)  Since May 2006, she has worked part-time at Molex "[c]heck[ing] traceability (mak[ing] sure parts are correct)[,] get[ting] station set up, [and] putting product on shelf."  (Id. at 146.)   A summary of the administrative record–including the medical records dating to (approximately) the alleged onset date–follows.

On February 11, 2005, the plaintiff visited Bryan LGH Medical Center-West in Lincoln, Nebraska, with complaints of a cough and difficulty breathing.  (Tr. at 221.)  An examination revealed decreased breath sounds and "rare wheezes," but her chest x-ray was "okay."  (Id. at 222, 224.)  After she was treated with "DuoNeb," she sounded "tremendously better" and her lungs were clear.  (Id. at 224.)  She was diagnosed with "bronchitis–asthmatic, chronic," prescribed various medications, and discharged in improved condition with instructions to follow-up with the Lincoln-Lancaster County Health Department if her condition did not improve further.  (Id. at 224-25.)

On May 1, 2005, the plaintiff was admitted to the Bryan LGH Medical Center with complaints of chest pressure and "an exacerbation" of asthma.  (Tr. at 245.)  She was given albuterol nebulizers and prednisone to treat her chronic obstructive pulmonary disease, and on May 2, 2005, she "underwent myocardial perfusion rest and stress imaging, which showed normal exercise stress myocardial perfusion scintigraphy with no evidence of re-infarct or reversible ischemia and an ejection fraction of 70%."  (Id.)  She was discharged home in stable condition and advised to "resume her normal activity and diet."  (Id.)

The plaintiff visited Brian Bossard, M.D., for a follow-up on July 20, 2005.  (Tr. at 276.)  She complained of "knee discomfort," back pain, and shoulder pain.  (Id.)  She also reported "continued tobacco use" and shortness of breath with activity.  (Id.)  Dr. Bossard diagnosed osteoarthritis and

---

[3] COPD is an abbreviation for chronic obstructive pulmonary disease.  Stedman's Medical Dictionary 439 (28th ed. 2006).

6

anserine bursitis, COPD and continued tobacco use, and hypothyroidism.  (Id.)  He directed the plaintiff to take Tylenol, discontinue using tobacco, and increase her exercise.  (Id.)

A medical record from Charles Kreshel, M.D., dated October 7, 2005, indicates that on that date the plaintiff reported breathing problems, knee pain, and shoulder pain.  (Tr. at 294.)  She said that she had been using inhaled albuterol, but that it was not helping lately.  (Id.)  Her chest examination and chest x-rays were normal.  (Id.)  The plaintiff's diagnoses included COPD, asthma, hypothyroidism, and estrogen deficiency, and she was prescribed various medications.  (Id. at 295.)

Another record from Dr. Kreshel indicates that on October 11, 2005, the plaintiff complained of pain in her knees, back, neck, fingers, and feet.  (Tr. at 293.)  She denied numbness, tingling, weakness, or joint redness or swelling.  (Id.)  She also indicated that "her lungs are much improved since starting the nebulizer treatments and Spiriva."  (Id.)  An examination revealed knee pain on extension, but x-rays of the knees showed no evidence of injury or abnormality.  (Id.)  The plaintiff was diagnosed with multiple arthralgias,[4] and medication was prescribed for her.  (Id.)

Sarah Grady, PAC, who works in Dr. Kreshel's office, referred the plaintiff to the Osteoporosis Center of Nebraska for a bone mineral density determination "because of estrogen deficiency."  (Tr. at 298.)  A bone mineral density report dated October 18, 2005, revealed "low bone mass in the lumbar spine, total femur, and femoral neck."  (Id.)

On November 23, 2005, a medical consultant reviewed the plaintiff's medical records and completed an RFC assessment.  (Tr. at 197-204.)  The consultant concluded that the plaintiff had the ability to lift 20 pounds occasionally and 10 pounds frequently, to stand or walk six hours in an eight-hour workday, and to sit for about six hours in an eight-hour workday.  (Id. at 198.)  The consultant also found that the plaintiff was limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; that she should avoid all climbing of ladders, ropes, and scaffolds; and that she should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dust, gas, "poor ventilation," and hazards.  (Id. at 199, 201.)

On February 20, 2006, the plaintiff visited the People's Health Center with complaints of hand cramps and pain in her left foot and right elbow.  (Tr. at 302.)  She indicated that she last saw

---

[4] Arthralgia is defined as "pain in a joint."  Stedman's Medical Dictionary 159 (28th ed. 2006).

her doctor in October and had been out of medication since December.  (Id.)  The examining physician's diagnoses included COPD and depression, and medications were prescribed.  (Tr. at 303.)

Judy C. Magnuson, Ph.D., prepared a psychological report after evaluating the plaintiff on March 14, 2006.  (Tr. at 305.)  Dr. Magnuson noted that the plaintiff had never received individual or marital counseling in the past and had never taken psychotropic medication until recently, when she received a prescription for Cymbalta.  (Tr. at 307; see also id. at 303 (indicating prescription of Cymbalta).)  Testing indicated that the plaintiff "was functioning consistently in the average range in all areas."  (Tr. at 309.)  Dr. Magnuson's evaluation states,

> Charlotte had no restrictions in activities of daily living or social functioning. She did not suffer from episodes of deterioration when stressed.  She displayed the ability to sustain concentration and attention needed for task completion.  She displayed the ability to understand, remember and carry out short and simple instructions under ordinary supervision.  She displayed the ability to relate well to co-workers and supervisors and to adapt to changes in her environment.
>
> . . . .
>
> Charlotte's prognosis for being able to continue functioning well at her current level is very good.

(Tr. at 309-310.)

On March 30, 2006, the plaintiff visited the People's Health Center with complaints of pain in her neck, shoulders, and back.  (Tr. at 327.)  The plaintiff declined neck x-rays or an MRI "due to cost."  (Tr. at 328.)  She was diagnosed with "hypothyroid," "neck pain/spasms," and COPD, and she was prescribed flexeril for muscle spasms.  (Id.)

The plaintiff visited the People's Health Center on June 30, 2006, complaining that her hip goes numb after she sits "for a while," that her "knee gets sharp pains," and that her right hand "locks up."  (Tr. at 325.)  She indicated that flexeril helped with her complaints.  (Id.)  She also indicated that she began part-time work on May 31.  (Id.)  The plaintiff was prescribed medication and directed to begin physical therapy.  (Tr. at 326.)  A lumbar MRI was also ordered.  (Id.)  The MRI, which was performed on July 7, 2006, revealed a mild disc bulges at L4-L5 and L5-S1, an annular tear at L4-L5

and a "very subtle" annular tear at L3-L4, a "very mild mass effect on the anterior thecal sac at L4-L5 and L5-S1," and "no evidence of neural foraminal stenosis or central canal stenosis."  (Tr. at 346.)

The plaintiff returned to the People's Health Center on September 5, 2006, with complaints of "ear popping" and "lung pain."  (Tr. at 323.)  She was diagnosed with an upper respiratory infection and instructed to take her medication as directed, decrease smoking, and increase her exercise.  (Tr. at 324.)

On July 18, 2007, the plaintiff appeared at the BryanLGH Medical Center West emergency room and reported that she had been urinating blood.  (Tr. at 340.)  She also complained of low back pain radiating down her right leg.  (Id.)  Her physician noted that she had a "very mild," "very subtle" limp when walking, and that moving her hip seemed to exacerbate her pain.  (Id.)  She was diagnosed with acute hemorrhagic cystitis and discharged home in stable condition with a prescription for Cipro.  (Tr. at 340, 343-45.)

The plaintiff returned to the emergency room on September 11, 2007, with complaints of left shoulder pain.  (Tr. at 349.)  She reported that she had been experiencing chronic pain in her left shoulder for the past two years, and that her shoulder was sore and almost unmovable after she spent time playing with her grandson.  (Id.)  Examination revealed pain, tenderness, and reduced range of motion in the shoulder, (id.), but x-rays revealed no abnormalities, (Tr. at 355).  She was diagnosed with a left shoulder strain, treated with pain medication, and instructed to wear a sling, ice her shoulder, and perform range of motion exercises.  (Tr. at 349.)

On January 29, 2008, the plaintiff returned to the emergency room with complaints of back pain.  (Tr. at 336.)  She reported that her son pushed her, causing her to fall into a chair and land on her side.  (Id.)  Examination revealed some muscle tenderness, but no bruising, swelling, or contusions.  (Id.)  The plaintiff told her physician that "she does not want x-rays because she knows that they will not show anything."  (Tr. at 337.)  She was treated with a shot of Valium and sent home with "muscle relaxants."  (Id.)

On February 7, 2008, the plaintiff visited the People's Health Center with complaints of back pain and "chest wall pain."  (Tr. at 320-21.)  Examination revealed tenderness and bruising on her chest wall.  (Tr. at 321.)  The plaintiff's diagnoses included cough, chest wall pain, and COPD, and

9

she was directed to take medications. (Id.) Her physician also wrote a note stating that the plaintiff could return to work on February 8, 2008. (Tr. at 322.)

On May 6, 2008, Jacqueline Calle, a payroll specialist at Oasis Staffing, completed a work performance assessment concerning the plaintiff. (Tr. at 136, 140, 143.) Ms. Calle indicated that the plaintiff had held "various positions" with the "temp agency" from April 16, 1999, through June 2, 2006. (Tr. at 136.) She also indicated that the quality and quantity of the plaintiff's work was satisfactory, that the plaintiff could follow instructions, perform at a consistent pace, and maintain adequate attendance, and that the company was "sufficiently satisfied with [the plaintiff's] performance" to "employ or rehire [her] on a full-time basis." (Tr. at 136-37, 139.)

A second work performance assessment was completed on May 21, 2008, by an H.R. Director at Molex Inc. (Tr. at 157, 162.) The director noted that the plaintiff had worked 20.5 hours per week at Molex since May 31, 2006, and that, although the plaintiff's "attendance was poor," the quality and quantity of her work "'meets' expectations." (Tr. at 157, 159.) She was also able to understand and follow instructions, perform at a consistent pace, and relate appropriately to supervisors and co-workers. (Tr. at 159-60.)

On May 28, 2008, the plaintiff appeared at the hearing before the ALJ. (See Tr. at 402.) She testified that she lives with her daughter and her daughter's children, ages two and nine. (Id. at 413.) Her daughter works from 11:00 p.m. until 7:30 a.m. (Id. at 413-14.) The plaintiff helps the older child get ready for school, cares for the younger child (while her daughter sleeps) until approximately 3 p.m., and then she goes to work from 4:00 p.m. until 8:00 p.m. (Id. at 422-23, 435.) She drives herself to work, (id. at 423), but she drives very little because she is concerned that her hands will cramp up and cause her to have an accident, (id. at 425). Her hand cramps affect mainly her right hand and cause her to lose her grip on things. (Id. at 427.) The cramps usually last for five to ten minutes, but on one occasion they lasted for 45 minutes. (Id. at 429.) She testified that she cannot vacuum, make beds, clean bathrooms, or do laundry at home due to pain in her hands and back. (Id. at 431-32.) She added that she can stand for no longer than ten minutes and that she can sit for one hour. (Id. at 433.)

The ALJ then asked a Vocational Expert ("VE") to consider whether the claimant could return to any of her past work if she "could occasionally lift or carry 20 pounds, frequently lift or

10

carry ten pounds, stand, walk, or sit six hours in an eight-hour day, occasionally could do all postural activities, but should not work on ladders, ropes, scaffolds, [and] should avoid concentrated exposure to cold heat, fumes, and hazards." (Tr. at 442.)  The VE responded that the claimant could perform the plaintiff's past light unskilled work as an inserting machine operator and a production assembler. (Id. at 443.)  The VE added that the plaintiff was currently performing "a sedentary production assembler job," which, like the position of production assembler that she performed in the past, requires frequent reaching, handling, and fingering.  (Id. at 443-44.)  The ALJ also asked the VE whether the plaintiff could return to her past work as a production assembler or inserting machine operator "[i]f her testimony is considered to be credible."  (Id. at 445.)  The VE responded in the negative, emphasizing the plaintiff's testimony about her hand cramps would rule out her past work (which requires frequent hand usage), as would her testimony that she could stand for only ten minutes and sit for one hour at a time.  (Id.)

The record also includes "supplemental information forms" from the plaintiff's daughter (dated November 15, 2005), sister (dated February 19, 2006), son (dated February 26, 2006), and niece (dated March 12, 2006).  (Tr. at 76-78, 119-128.)  The plaintiff's daughter indicated that the plaintiff "wakes up all through the night because of breathing problems or pains," has problems interacting with others and dealing with stress, forgets things, and cannot help around the house much due to her hand cramps and leg pain.  (Id. at 76-78.)  The plaintiff's sister indicated that the plaintiff's daughter helps her with meals and chores, that the plaintiff has a short temper, and that her pain affects her concentration.  (Id. at 119-121.)  The plaintiff's son indicated that the plaintiff does not prepare her meals, do chores, watch television, care for children, participate in any activities, or engage in any hobbies.  (Id. at 122-23.)  He added that the plaintiff "doesn't leave home because she's scared she won't be able to breath[e]," and that she spends her days sitting "around the house all day looking out the window."  (Id. at 123-24.)  The plaintiff's niece indicated that the plaintiff cannot do chores or take care of children, cries in stressful situations, and cannot maintain attention.  (Id. at 125-28.)

11

# IV.   ANALYSIS

The plaintiff argues that the Commissioner's decision must be reversed because the ALJ erred in discrediting the plaintiff's claims about the severity of her subjective complaints.  (See, e.g., Pl.'s Br. at 7, ECF No. 22.)  As noted above, the VE testified that if the plaintiff's testimony about her limitations–particularly her severe hand cramps and her inability to stand for more than ten minutes or sit for more than one hour at a time–were credible, she would be unable to return to her past relevant work as a production assembler or an inserting machine operator.  (See Tr. at 445.)  The ALJ discredited the plaintiff's testimony, however, and found that she had an RFC that would allow her to perform those jobs.  (Id. at 18-22.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)).  "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints."  Id. (citation omitted) (alteration in original).  "The ALJ need not explicitly discuss each factor, however."  Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints."  Id. (quoting Goff, 421 F.3d at 791) (alteration in original).

In her decision, the ALJ noted the Polaski factors and specified the following reasons for discrediting the plaintiff's testimony: (a) the ALJ gave weight to her decision to discredit the plaintiff's testimony in a previous case; (b) the plaintiff had been "working twenty hours per week in a factory setting" with favorable work assessments; (c) the medical records "are not inconsistent with the performance of a light range of work," and the fact that the claimant had not been referred to physical therapy was "surprising"; (d) the plaintiff's testimony concerning her hand problems was not credible because she has not received "treatment for any carpal tunnel syndrome, she has not

12

undergone an EMG, . . . no doctors have placed greater functional limitations [on her] that would last at least twelve months," and she works "in an assembly job which requires her to use her hands frequently"; (e) "the record contains no statements by any treating source that the claimant is more limited than found in the residual functional capacity"; and (f) the VE "testified that [the] claimant's present work is described as sedentary product assembler, and [it] requires hand usage of frequent to constant." (Tr. at 21-22.)  The plaintiff claims that each of the six points cited by the ALJ are insufficient to support the ALJ's credibility determination. (Pl.'s Br. at 8, ECF No. 22.)  She argues further that the ALJ erred by ignoring third-party witness statements describing the plaintiff's limitations. (Id. at 28.)  I shall review each of the plaintiff's arguments in turn.

## A.

The plaintiff argues first that it was error for the ALJ to give weight to her assessment of the plaintiff's credibility in a previous case. (Pl.'s Br. at 8-9, ECF No. 22.)  The defendant "concedes [that] the ALJ should not have afforded 'weight' to her credibility finding on [the p]laintiff's prior application," but argues that the ALJ's error was harmless "given the other substantial evidence cited by the ALJ to support her decision." (Def.'s Br. at 18-19, ECF No. 29.)

In support of his argument that the ALJ's error was harmless, the defendant refers me to Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).  (See Def.'s Br. at 19, ECF No. 29.)  In Hepp, the ALJ's decision stated that the claimant was able to perform medium work and could perform his past relevant work as a "fish processor."  511 F.3d at 803, 806.  It also included an "inconsistent paragraph," however, stating that the claimant was unable to perform his past relevant work. Id.  The claimant argued that the case should be remanded because "the inconsistent paragraph renders unclear whether the ALJ determined that Hepp could perform his past relevant work and . . . the ALJ should have applied the Medical-Vocational Guidelines because the inconsistent paragraph indicated that Hepp could not perform his past relevant work." Id.  The Eighth Circuit rejected the claimant's arguments, explaining,

> Although an unfortunate deficiency, the incongruous paragraph had no bearing on the outcome.  First, the opinion remained clear that Hepp could perform his past relevant work as a fish processor.  Second, the ALJ clearly determined that Hepp was not disabled at step four, and the Medical-Vocation Guidelines are applied only at step

13

five.  Because he determined that Hepp was not disabled at step four, the ALJ did not
need to reach step five.  Consequently, the deficiency does not require reversal since
it had no bearing on the outcome.

511 F.3d at 806 (citation omitted).

Although <u>Hepp</u> does stand for the general proposition that a "deficiency in opinion-writing technique" can be harmless, it is otherwise not analogous to the case before me.  Unlike <u>Hepp</u>, here there is no indication that the relevant portion of the ALJ's decision is an obvious incongruity that may safely be disregarded; rather, it establishes that the ALJ's credibility analysis was influenced by an improper factor.

Nevertheless, it is possible that the ALJ's error had no bearing on the outcome of the case.  If the record as a whole weighs so heavily against the plaintiff's credibility "that the ALJ would necessarily have disbelieved her absent the erroneous inferences that [s]he drew from the record," then a remand is unnecessary.  <u>Ford v. Astrue</u>, 518 F.3d 979, 983 (8th Cir. 2008).  <u>See also</u> <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding that remand was unnecessary despite ALJ's error because substantial evidence supported the ALJ's conclusion on the claimant's credibility).  I shall review the remaining reasons offered by the ALJ in support of her credibility decision–and the plaintiff's criticisms of those reasons–with this principle in mind.

**B.**

The plaintiff submits that it was improper for the ALJ to discredit her subjective complaints on the ground that she had been working part-time with favorable reviews.  (Pl.'s Br. at 15, ECF No. 22.)  She argues that "the ALJ cannot use the Molex job . . . nor the Oasis job to discount [her] credibility when neither job was [substantial gainful activity] or entitled to past relevant work status," and she adds that her Molex work assessment actually corroborates her testimony that she would be unable to work full-time there due to her health and poor attendance  (<u>Id.</u> at 15-16.)  I find, however, that it was reasonable for the ALJ to conclude that the plaintiff's part-time work was inconsistent with her testimony about the severity of her hand cramps and her limited ability to sit or stand.  <u>See, e.g.</u>, <u>Harris v. Barnhart</u>, 356 F.3d 926, 930 (8th Cir. 2004); <u>see also</u> 20 C.F.R. §

14

404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); 20 C.F.R. § 416.971.

## C.

In discrediting the plaintiff's testimony, the ALJ wrote,

> The claimant's Magnetic Resonance Image (MRI) in 2006 shows a central disc bulge at L4-L5 and L5-S1, annular tears at L3-L4 and L4-L5, and a "very mild" mass effect on the anterior thecal sac at L4-L5 and L5-S1.  While these findings reasonably suggest some ongoing functional limitations prohibiting greater exertional activities, other records, including the lack of evidence of neural foraminal stenosis or central canal stenosis, are not inconsistent with the performance of a light range of work.  For example, the claimant has not been referred to orthopedic or physical therapists, which seems surprising when considering the extent of the claimant's back pain.

(Tr. at 21 (citation omitted).)  As the plaintiff correctly notes, that the ALJ's finding that the plaintiff had not been referred to physical therapy is contradicted by the record: there is evidence that physical therapy was recommended for the plaintiff.  (See Tr. at 326.)  On other occasions, she was instructed to exercise.  (See Tr. at 276, 324, 349.)

The plaintiff also argues that "the lack of specific types of medical records should not be used to discount [her] credibility, particularly if there have been reasons given by the claimant that explain the problems with obtaining specific testing or [the] lack of medical treatment."  (Pl.'s Br. at 17, ECF No. 22.)  She adds,

> The claimant mentioned at the hearing that she did not have money to seek medical treatment with specialists.  In essence, the ALJ is penalizing the claimant for being poor and not being able to afford medical treatment.  It is alleged that the claimant established good reason for not seeking treatment from specialist [sic] for her complaints, and that the ALJ was in error in finding that the lack of specific medical test results, or referrals to specialists, provided substantial evidence to support the finding of "lack of credibility" as to the severity of the claimant's subject[ive] symptoms.  It is alleged that a lack of evidence cannot be interpreted as substantial evidence to support the ALJ's findings.

(Id. at 21-22.)

It is not improper for the ALJ to consider the treatment–or lack thereof–that the plaintiff has received when assessing the extent to which the plaintiff's symptoms affect her ability to perform

15

work activities.  See 20 C.F.R. § 404.1529(c)(3)-(4); 20 C.F.R. § 416.929(c)(3)-(4); SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . .").  However, "the adjuducator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996).  See also Dover v. Bowen, 784 F.2d 335, 337 (8th Cir. 1986) ("Although it is permissible in assessing the severity of pain for an ALJ to consider a claimant's medical treatment and medications, the ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances.").  "Economic justifications for the lack of treatment can be relevant to a disability determination," unless there is "no testimony or other evidence that [the plaintiff] had been denied further treatment or access to prescription pain medicine on account of financial constraints." Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994).  See also SSR 96-7p, 1996 WL 374186, at *8 (July 2, 1996) (indicating that an adjudicator should consider whether an "individual may be unable to afford treatment and may not have access to free or low-cost medical services.").

The record in this case indicates that the plaintiff has struggled to find funds for health care, (Tr. at 102-105, 424); that she gets care from a low-cost clinic, but the clinic requires her to pay a co-pay on the day of service, (id. at 424); that she may have been deterred from pursuing treatment for her hand cramps at this clinic due to the expense of the relevant tests, (id. at 447); and that she once declined a neck x-ray or MRI "due to cost," (id. at 328).  In short, there is evidence that the plaintiff's access to treatment and diagnostic testing was limited by financial constraints.  In her decision, the ALJ did not indicate that she considered this explanation for the "surprising" lack of certain medical evidence in the record.  Therefore, to the extent that the ALJ drew "inferences about [the plaintiff's] symptoms and their functional effects from a failure to seek or pursue regular medical treatment," the ALJ's analysis is in conflict with SSR 96-7p.  This conflict, together with the ALJ's plainly erroneous finding that the plaintiff was not referred for physical therapy, persuades me that the plaintiff's challenge to this aspect of the ALJ's credibility determination has merit.  The

ALJ did not articulate a proper basis for discrediting the plaintiff due to a lack of medical findings or therapy referrals.

**D.**

Relatedly, the ALJ cited the plaintiff's lack of treatment for her "hand problems" in discrediting her testimony, stating,

> The claimant also alleges having significant hand pain and limitations, but the record does not contain any treatment for any carpal tunnel syndrome, she has not undergone an EMG, and no doctors have placed greater functional limitations that would last at least twelve months. When considering the claimant's rather extreme testimony concerning significant hand problems, the undersigned finds this to be incredible in light of her working after her amended alleged onset of disability in an assembly job which requires her to use her hands frequently.

(Tr. at 21 (citations omitted).) I have explained previously that it was proper for the ALJ to consider the plaintiff's part-time work at Molex when evaluating the plaintiff's credibility. (See supra Part IV.B.) Also, the fact that none of the plaintiff's treating physicians placed significant restrictions upon her provides a proper basis for discrediting the plaintiff's testimony about the extent of her limitations. See, e.g., Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). In other respects, however, the ALJ's credibility assessment is problematic.

As I noted in Part C above, although it is generally appropriate for an ALJ to consider a claimant's lack of treatment for a particular condition when assessing the claimant's ability to perform work, the ALJ must also consider the claimant's explanations for that lack of treatment. SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). The record shows that the plaintiff's ability to obtain health care was limited by her lack of funds, and it is particularly noteworthy that the plaintiff testified during the hearing that she was deterred from seeking carpal tunnel tests at the low-cost clinic due to the expense. (See supra Part IV.C (citing, inter alia, Tr. at 447).) There is no indication that the ALJ considered this explanation before citing the plaintiff's failure to obtain certain treatment and testing to support an inference that the plaintiff's allegations of hand cramps were not credible. I find, therefore, that this aspect of the ALJ's credibility determination is unsound.[5]

---

[5] I note in passing that the defendant argues that the record "reveals only one isolated visit where Plaintiff actually made complaints about her hands, and the contemporaneous records from that visit do not indicate that her medical professionals through a referral for further

**E.**

In the next paragraph of her decision, the ALJ re-emphasized that "the record contains no statements by any treating source that the [plaintiff] is more limited than found in the residual functional capacity" assessment.  (Tr. at 21.)  Although the plaintiff argues to the contrary, (see Pl.'s Br. at 23-24, ECF No. 22), this was not error, see Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

The ALJ also stated, "The undersigned reviewed and gives significant weight to the analysis performed by the state agency."  (Tr. at 22 (citation omitted).)  The plaintiff submits that the ALJ afforded too much weight to the state agency physician's opinion because the plaintiff continued to receive treatment after the agency physician issued the opinion, and therefore the opinion was not based on a complete record of the plaintiff's treatment history.  (Pl.'s Br. at 24-25, ECF No. 22.)  As the defendant correctly notes, however, the regulations require the ALJ to consider the findings of state agency consultants (though these findings are not binding).  (See Def.'s Br. at 16, ECF No. 29 (citing 20 C.F.R. § 404.1527(f)(2)(i); 20 C.F.R. § 416.927(f)(2)(i)).)  Moreover, there is no indication that the ALJ failed to consider the record as a whole–including the records that were made subsequent to the state agency physician's opinion–when formulating the plaintiff's RFC.  (See Tr. at 22 (indicating that the ALJ considered the entire record and found the state agency physician's opinion to be "generally consistent" with the record).)

The plaintiff also argues that the ALJ failed to fully develop the record and that the case ought to be remanded "for a consultative examination" focusing on the plaintiff's back and hands.

---

specialized treatment was necessary."  (Def.'s Br. at 14, ECF No. 29 (citing Tr. at 302).)  The "isolated visit" noted by the defendant occurred on February 20, 2006, when the plaintiff presented complaints of "hand cramps" at the People's Health Center.  (Tr. at 302.)  Although it is true that the plaintiff was not referred for "specialized treatment" during this visit, it is not clear whether specialized testing was ordered.  (See id. at 303 (indicating that "CBS, TSH, [and] R [illegible symbol] Factor" testing was ordered).)

Moreover, the record shows that the plaintiff discussed her hand cramps with a psychologist on March 14, 2006, (see Tr. at 305), and she re-presented her complaints of hand cramps to the People's Health Clinic on June 30, 2006, (Tr. at 325), after she began working at Molex.  Thus, it is not accurate to suggest that the plaintiff complained about her hands during "only one isolated visit."

18

(Pl.'s Br. at 25, ECF No. 22.)  The ALJ does have a duty to develop the record fully and fairly, e.g., Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004), but she is only required to order a consultative examination when one would be necessary for an informed decision, see Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)).  If the record "includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue" that can provide a substantial basis for the ALJ's findings about the claimant's functional abilities, then the record is adequate.  Strongson, 361 F.3d at 1071-72.  Although aspects of the ALJ's credibility determination are problematic, I am not persuaded that the record lacks substantial evidence from treating physicians who have evaluated "the particular impairments at issue," including the plaintiff's back and hands.[6]  I shall not order a remand for a consultative examination.

## F.

The ALJ's decision states, "Lastly, the vocational expert testified that claimant's present work is described as sedentary product assembler, and requires hand usage of frequent to constant." (Tr. at 22.)  As I explained previously, it is proper for the ALJ to consider the plaintiff's part-time work when evaluating the credibility of her testimony.  (See supra Part IV.B (citing Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); 20 C.F.R. § 404.1571; 20 C.F.R. § 416.971).) Therefore, I reject the plaintiff's argument that her part-time work cannot be used to support the ALJ's credibility finding.

## G.

Finally, the plaintiff argues that the ALJ erred by failing to consider third-party witness statements in accordance with Social Security Ruling (SSR) 96-7p, which states that family and friends "may provide information from which inferences and conclusions may be drawn about the credibility of the [claimant's] statements."  1996 WL 374186, at *8 (July 2, 1996).  The plaintiff

---

[6] In other words, it does not follow from the fact that the ALJ failed to consider the plaintiff's explanations for the absence of certain testing that the record lacks sufficient medical evidence about the plaintiff's impairments.

concedes that the ALJ's decision includes a "blanket statement" that the witness statements were considered; she argues, however, that the ALJ was required to "make . . . comments on these statements to discount them, or to show that they were inconsistent with the record as a whole." (Pl.'s Br. at 28, 32.)  The defendant disagrees, stating that the ALJ need not make express findings about the credibility of family members' testimony when their testimony is merely cumulative with the other evidence in the record.  (Def.'s Br. at 18, ECF No. 29 (citing, inter alia, Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000); Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995).)  I take the defendant's argument to be that, because the third-party statements are "discredited by the same evidence that discredits [the plaintiff's] own testimony concerning [her] limitations," the ALJ's failure to specifically discredit those statements has no bearing on the outcome.  Lorenzen, 71 F.3d at 319.

I agree with the defendant that the factors cited by the ALJ in her analysis of the plaintiff's credibility apply with equal force to the evidence submitted by the plaintiff's family members.  As I have noted above, however, some of the factors cited by the ALJ were applied in error.  Under the circumstances, I cannot find that the third-party witness statements were properly discredited.

In summary, after consideration of the entire record in this case, I conclude that a remand is necessary.  The ALJ articulated several valid bases for discrediting the plaintiff's testimony, citing evidence that 1) the plaintiff worked twenty hours per week in a job that required frequent use of her hands despite complaints of disabling hand cramps, 2) the plaintiff received favorable work reviews in that position, 3) no physicians had opined that the plaintiff suffered from disabling limitations, and 4) the plaintiff was found to be capable of light work by a state agency physician.  However, the ALJ also discredited the plaintiff based on a lack of referrals to physical therapy when in fact she was referred for such therapy, and she drew inferences about the plaintiff's failure to obtain certain treatment or tests without considering the plaintiff's clearly-articulated explanations for those failures. Moreover, the ALJ improperly slanted her credibility analysis against the plaintiff by giving weight to her decision to discredit the plaintiff in a previous case.  Under the circumstances, I cannot say that the record weighs so strongly against the plaintiff's credibility that the ALJ would necessarily have disbelieved the plaintiff in the absence of these errors.  See Ford v. Astrue, 518 F.3d 979, 983 (8th Cir. 2008).  The case must therefore be remanded for further proceedings.

The plaintiff asks that the case be remanded for a hearing before a different ALJ.  (See, e.g., Pl.'s Br. at 26, ECF No. 22.)  I am not persuaded that the ALJ is biased against the plaintiff.  The transcript of the hearing indicates that the proceedings were conducted professionally, and there is no hint of the sort of conduct or errors that have characterized "remands to different judges" in past cases.  See, e.g., Frohm v. Barnhart, 58 F. App'x 712 (9th Cir. 2003); Bronson v. Barnhart, 56 F. App'x 793 (9th Cir. 2003).  The circumstances of this case are unusual, however, because the ALJ has already made assessments of the plaintiff's credibility on two occasions and has formed an opinion on that issue.  Therefore, I find that if the Commissioner determines that a new hearing is necessary, it should be held before another ALJ.

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with the memorandum accompanying this order.

Dated November 3, 2010.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge

21